**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 19-3757 (JEB)** |
| **U.S. OFFICE OF SPECIAL COUNSEL,** *et al.*, | |
| **Defendants.** | |

## MEMORANDUM OPINION

Over the last few years, Plaintiff Citizens for Responsibility and Ethics in Washington has filed several administrative complaints with Defendant Office of Special Counsel. Those complaints allege that White House Counselor Kellyanne Conway has repeatedly violated the Hatch Act — a law that bars federal employees from engaging in political activity in the course of their work. After conducting an investigation, OSC largely agreed, deeming many of Plaintiff's allegations meritorious. It thus issued a report to President Donald Trump, detailing Conway's myriad infractions and recommending her removal. The President rejected the agency's recommendation and imposed no penalty on Conway.

This case asks whether CREW — and, by extension, this Court — can do anything about that. In CREW's view, OSC erred in submitting its findings to the President. The Act's enforcement scheme, according to Plaintiff, dictates that Defendant should have instead initiated disciplinary proceedings against Conway in front of the Merit Systems Protection Board, an independent quasi-judicial agency with jurisdiction to adjudicate Hatch Act complaints and remove offenders.

1

CREW's suit asserts that OSC's non-prosecution decision violates the Administrative Procedure Act.  It therefore asks the Court, among other things, to declare OSC's action unlawful and to compel it to commence MSPB proceedings against Conway.  Defendant now moves to dismiss, contending that CREW lacks standing and fails to state a claim.  As the Court agrees with the former argument, it need not reach the latter.  Such a ruling means that CREW must seek other avenues to hold Conway accountable for her misdeeds.

## I.    Background

The Court begins by laying out the relevant legal landscape before recounting the factual and procedural history of this case.

### A.  Statutory Schemes

Enacted in 1939, the Hatch Act reflects a longstanding judgment "that partisan political activities by federal employees must be limited if the Government is to operate effectively and fairly, elections are to play their proper part in representative government, and employees themselves are to be sufficiently free from improper influences."  U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, 413 U.S. 548, 564 (1973); see generally An Act to Prevent Pernicious Political Activities, Pub. L. No. 76-252, 53 Stat. 1147 (1939); Hatch Act Reform Amendments of 1993, Pub. L. No. 103-94, 107 Stat. 1001 (codified in scattered sections of Title 5 of U.S. Code).  The enactment of this statute also "reflected 'the conviction that the rapidly expanding Government work force should not be employed to build a powerful, invincible, and perhaps corrupt political machine.'"  United States v. Nat'l Treasury Emps. Union, 513 U.S. 454, 471 (1995) (quoting Letter Carriers, 413 U.S. at 565).

To achieve those ends, the Act restricts the political activity of "any individual, other than the President and the Vice President, employed or holding office in . . . an Executive agency

2

other than the Government Accountability Office," 5 U.S.C. § 7322(1), including White House Office employees.  See 27 U.S. Op. Off. Legal Counsel 118 (May 23, 2003), 2003 WL 25728359 (concluding that WHO is Executive agency for Hatch Act purposes).  Specifically, the Act bars a covered employee from, inter alia, "us[ing] his official authority or influence for the purpose of interfering with or affecting the result of an election."  5 U.S.C. § 7323(a)(1).  Under the relevant regulations, this can encompass using one's "official title while participating in political activity," 5 C.F.R. § 734.302(b)(1), which is defined as "an activity directed toward the success or failure of a political party, candidate for partisan political office, or partisan political group."  Id. § 734.101.

The Hatch Act's enforcement scheme is set out in the Civil Service Reform Act, which Congress passed in 1978.  See generally An Act to Reform the Civil Service Laws, Pub. L. No. 95-454, 92 Stat. 1111 (1978).  By way of brief background, the CSRA "comprehensively overhauled the civil service system."  Lindahl v. OPM, 470 U.S. 768, 773 (1985).  Cognizant of the "haphazard arrangements for administrative and judicial review of personnel action" that had proliferated over time, Congress replaced that "patchwork system with an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration."  United States v. Fausto, 484 U.S. 439, 444–45 (1988).

As part of that broad reform, the CSRA created the Office of Special Counsel, an independent agency whose primary mission is to safeguard the civil-service merit system.  See 5 U.S.C. § 1211 et seq.  To fulfill that mission, OSC is tasked with investigating allegations concerning violations of the Hatch Act, among other statutes.  Id. § 1216(a)(1).  Any person or entity may file with the agency an administrative complaint alleging that a federal employee has

engaged in prohibited political activity in violation of the Act.  Id. § 1216(c).  After receiving

such a complaint, OSC "may investigate and seek corrective action."  Id.  If, after an

investigation, OSC determines that disciplinary action is warranted, Section 1215(a)(1) of the

CSRA provides for the agency to prepare and present a complaint to the Merit Systems

Protection Board.  That provision, in relevant part, states:

> [T]he Special Counsel shall prepare a written complaint against the
> employee containing the Special Counsel's determination, together
> with a statement of supporting facts, and present the complaint and
> statement to the employee and the [MSPB], in accordance with this
> subsection.

Id. § 1215(a)(1).  The CSRA carves out an exception for employees "in a confidential, policy-

making, policy-determining, or policy-advocating position appointed by the President, by and

with the advice and consent of the Senate."  Id. § 1215(b).  If an employee falls within this

exception, the Special Counsel's complaint "shall be presented to the President for appropriate

action in lieu of being presented [to the MSPB]."  Id.

In cases where the complaint is presented to the MSPB — a quasi-judicial agency with

original jurisdiction over Hatch Act complaints, id. § 1204(a)(1) — the employee is subject to a

disciplinary action proceeding.  Id. § 1215(a)(2)–(3).  Ultimately, the Board may dismiss the

allegations or, upon finding a violation, impose "disciplinary action" ranging from reprimand to

removal from federal service.  Id. § 1215(a)(3)(A).  An employee subject to any such

disciplinary action is entitled to judicial review in the Federal Circuit.  Id. §§ 1215(a)(4),

7703(b)(1).

One final piece of legislation bears mention because it is the centerpiece of OSC's merits

argument.  Shortly after enacting the CSRA, Congress passed a law "to clarify the authority for

employment of personnel in the [WHO] and the Executive Residence at the White House."  Pub.

L. No. 95-570, 92 Stat. 2445 (1978), codified at 3 U.S.C. § 105.  This legislation authorized the

President, subject to applicable salary limits, "to appoint and fix the pay of employees in the

White House without regard to any other provision of law regulating the employment or

compensation of persons in the Government service."  3 U.S.C. § 105(a)(1).  Congress,

moreover, directed that employees appointed in the WHO "shall perform such official duties as

the President may prescribe."  Id.  How this statute relates to the CSRA is ultimately a question

this Court does not reach.

      B.  Factual History

      As it must at this stage, the Court draws the facts from the Complaint.  See Sparrow v.

United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).  Since January 20, 2017, Conway

has served as a non-Senate-confirmed Counselor to President Trump in the White House Office.

See ECF No. 1 (Complaint), ¶¶ 9, 29.  In late 2017, OSC received several complaints alleging

that she had violated the Hatch Act by engaging in political activity while participating in

interviews in her official capacity on television news programs.  Id., ¶ 30.  More precisely, the

complaints charged Conway with improperly endorsing Republican Candidate Roy Moore and

opposing Democrat Doug Jones in the December 2017 Alabama special election for U.S. Senate.

Id. (citing ECF No. 1-1 (Mar. 6, 2018, OSC Report) at 1).

      OSC investigated these allegations and determined that Conway had indeed used her

"official authority or influence for the purpose of interfering with or affecting the result of an

election" on two separation occasions, both in violation of federal law.  See Mar. 6, 2018, OSC

Rep. at 7; see also id. at 7–10 (findings).  It subsequently referred its findings to the President for

"appropriate disciplinary action."  Id. at 10.  Trump, according to Plaintiff, "ignored OSC's

report and took no disciplinary action against" his Counselor.  See Compl., ¶ 32.

Conway's troubles with the Act did not end there, however.  In the months that followed, CREW filed two administrative complaints with OSC, alleging that her conduct again ran afoul of the law.  Id., ¶¶ 34, 36 (discussing October 2018 and May 2019 complaints).  Defendant proceeded to open two investigations, id.; see also ECF No. 1-5 (May 30, 2019, OSC Report), and ultimately agreed, concluding that Conway "repeatedly continues to violate the [Act]."  May 30, 2019, OSC Rep. at 3.  More concretely, Defendant explained that she had leveled "partisan attacks on several Democratic Party candidates" for President during official media interviews. Id. at 2.  It also found that she had engaged in significant political activity by advocating against these candidates and endorsing the President's re-election on her Twitter account.  Id. at 3.

Additionally, OSC identified "[n]umerous aggravating factors" related to Conway's conduct.  Id.  To begin with, it noted that she "has substantial knowledge of the . . . Act and was previously found to have violated the law by engaging in very similar conduct."  Id.  Second, Defendant had "repeatedly requested that [she] comply with the law."  Id.  Finally, even after OSC had previously reported her conduct to the White House, Conway nevertheless "escalated her partisan critiques of candidates."  Id.  In May 2019, OSC issued a report to the President detailing these violations and "respectfully request[ed] . . . Conway's removal from federal service."  Id. at 17.

A few weeks after receiving the report, the White House Counsel penned a response to OSC, taking issue with several facets of the investigation.  See Compl., ¶ 41.  In his opinion, the report was "based on multiple fundamental legal and factual errors, makes unfair and unsupported claims," "ignore[d] statutory-notice requirements, and has been influenced by various inappropriate considerations."  Id. (quoting Letter of June 11, 2019, from Pat Cipollone

to Henry Kerner).  In the end, the President "swiftly rejected" Defendant's recommendations. Id., ¶ 40.

Dissatisfied with OSC's decision to refer its findings to the President, Plaintiff sent a letter to the agency urging it to "take additional steps to ensure compliance with and enforcement of the . . . Act."  Id., ¶ 43.  In particular, CREW asked Defendant to "fil[e] complaints in the [MSPB] against non-Senate-confirmed presidential appointees whose actions, like . . . Conway's, OSC ha[d] found violated the . . . Act and warrant[ed] disciplinary actions."  Id. (emphasis added) (second alteration in original).  OSC's decision not to do so, Plaintiff pointed out, only emboldened Conway and other White House officials to continue to openly violate the Act.  Id. Defendant took no formal action in response to this letter.  Id., ¶ 44.

C.  Procedural History

On December 17, 2019, CREW brought the present action in this Court, asserting two claims under the APA against OSC and its Special Counsel Henry Kerner, whom the Court will jointly refer to as OSC or Defendant.  First, Plaintiff maintains that OSC's failure to present its Hatch Act complaint against Conway to the MSPB is an "unlawfully withheld" agency action, see 5 U.S.C. § 706(1), and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see Compl., ¶¶ 57–65.  Second, CREW contends that Defendant has a "policy of categorically not filing MSPB complaints against non-Senate-confirmed presidential appointees," which is also "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the APA.  Id., ¶¶ 66–71 (citing 5 U.S.C. §§ 706, 1215).

To remedy these purported ills, Plaintiff seeks an order (1) declaring OSC's non-enforcement policy and its non-enforcement decision as to Conway unlawful, (2) compelling

OSC to commence MSPB proceedings against Conway, and (3) barring OSC from following its alleged non-enforcement policy in relation to CREW's Hatch Act complaints.  Id. at 23.  In response, Defendant moves to dismiss the Complaint in its entirety, asserting that CREW lacks standing and has failed to state an APA claim.  See ECF No. 10 (Def. MTD) at 3, 12.

## II.    Legal Standard

Because the Court concludes that Plaintiff lacks standing, see infra Section III, it need not address the standard governing a Rule 12(b)(6) motion to dismiss and will instead consider this case under Rule 12(b)(1).  When a defendant seeks dismissal under that part of the Rule, the plaintiff must show that the Court has subject-matter jurisdiction to hear his claim.  See Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  "Absent subject matter jurisdiction over a case, the court must dismiss [the claim]."  Bell v. U.S. Dep't of Health & Human Servs., 67 F. Supp. 3d 320, 322 (D.D.C. 2014).  "Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion [also] imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."  Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).

In policing its jurisdictional borders, a court must scrutinize the complaint, granting the plaintiff the benefit of all reasonable inferences that can be derived from the alleged facts.  See Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  A court need not rely "on the complaint standing alone," however, but may also look to undisputed facts in the record or resolve disputed ones.  See Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).

### III.   Analysis

In considering the standing inquiry here, the Court starts with an exposition of the nuanced legal test and then turns to its application.

    A.   Organizational-Standing Requirements

Not every disagreement merits a lawsuit.  Federal courts decide only "cases and controversies," a phrase given meaning by the doctrine of "standing."  Whitmore v. Arkansas, 495 U.S. 149, 154–55 (1990); see U.S. Const. art. III, § 2, cl. 1.  A party's standing "is an essential and unchanging part of the case-or-controversy requirement of Article III."  Lujan, 504 U.S. at 560.  To have standing, a party must, at a constitutional minimum, meet the following criteria.  First, it "must have suffered an 'injury in fact' — an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not 'conjectural' or 'hypothetical.'"  Id. (internal quotation marks and citations omitted).  Second, "there must be a causal connection between the injury and the conduct complained of — the injury has to be 'fairly trace[able] to the challenged action of the defendant, and not . . .th[e] result [of] the independent action of some third party not before the court.'"  Id. (alterations in original) (citation omitted).  Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  Id. at 561 (citation omitted).  A "deficiency on any one of the three prongs suffices to defeat standing."  U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).

Organizations can satisfy Article III standing in one of two ways.  They can sue either on their own behalf ("organizational standing") or on behalf of their members ("representational standing").  See Abigail All. for Better Access to Developmental Drugs v. Eschenbach, 469 F.3d 129, 132 (D.C. Cir. 2006).  CREW invokes only the former here.  To prevail, consequently, it

must show that the organization itself, like any individual plaintiff, satisfies the three familiar elements of standing — (1) injury, (2) causation, and (3) redressability.  See Equal Rights Ctr. v. Post Props., 633 F.3d 1136, 1138 (D.C. Cir. 2011).

To state the rule's general architecture is easy; to define its more nuanced contours is not. As this Court has previously noted, organizational-standing doctrine in our Circuit is "not a model of clarity."  Ctr. for Responsible Sci. v. Gottlieb, 311 F. Supp. 3d 5, 9 (D.D.C. 2018); see also PETA v. USDA (PETA II), 797 F.3d 1087, 1099 (D.C. Cir. 2015) (Millet, J., dubitante) ("[I]t may be time, in an appropriate case, to revisit the proper metes and bounds of 'organizational standing.'").  The Court will nevertheless attempt to extract from the Circuit's caselaw a cohesive blueprint to guide its inquiry.

To satisfy the injury-in-fact requirement, an organization must allege a "concrete and demonstrable injury to [its] activities."  Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 919 (D.C. Cir. 2015) (alteration in original) (quoting PETA II, 797 F.3d at 1093).  Conversely, "a mere 'setback'" to the organization's "'abstract social interests' is not sufficient."  Equal Rights Ctr., 633 F.3d at 1138 (quoting Spann v. Colonial Vill., Inc., 899 F.2d 24, 27 (D.C. Cir. 1990)). Organizations cannot, therefore, establish standing when they seek only to "vindicate their own value preferences through the judicial process."  Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent. Inc., (ASPCA), 659 F.3d 13, 25 (D.C. Cir. 2011) (quoting Sierra Club v. Morton, 405 U.S. 727, 740 (1972)).

Our Circuit memorializes this distinction in a two-part test: the Court must ask first "whether the agency's action or omission to act 'injured the [organization's] interest'"; then, if satisfied, it inquires whether "the organization 'used its resources to counteract that harm.'" PETA II, 797 F.3d at 1094 (alteration in original) (quoting Equal Rights Ctr., 633 F.3d at 1140);

accord Food & Water Watch, 808 F.3d at 919 (employing same test); see also Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982) (finding organizational injury based on an "injury to the organization's activities" followed by "the consequent drain on the organization's resources"). A few words on each of these prongs is in order.

Start with the requirement of an injury to the organization's interest. To pass muster under this prong, the challenged activity must "perceptibly impair[] the organization's ability to provide services." Food & Water Watch, 808 F.3d at 919 (quoting Turlock Irrigation Dist. v. FERC, 786 F.3d 18, 24 (D.C. Cir. 2015)). Put otherwise, it must "inhibit[]" the organization's "daily operations" in a concrete way. PETA II, 797 F.3d at 1094; see also Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Def., No. 14-1915, 2016 WL 4435175, at *6 (D.D.C. Aug. 19, 2016) (requiring that challenged conduct "undermine the organization's ability to perform its fundamental programmatic services"). A necessary aspect of this requirement is that there be a "direct conflict between the defendant's conduct and the organization's mission." Abigail All., 469 F.3d at 133. Alone, however, this conflict is insufficient. Id. As such, the Court's task is to differentiate between "organizations that allege that their activities have been impeded" — which suffices for standing purposes — "from those that merely allege that their mission has been compromised" — which does not. Id. (emphasis added).

Once this first prong is met, the Court moves on to the second and asks "whether the organization used its resources to counteract that harm." Food & Water Watch, 808 F.3d at 919. Not all uses of resources count, however. For one, resources spent educating the public or the organization's members cannot establish Article III injury "unless doing so subjects the organization to 'operational costs beyond those normally expended.'" Food Water Watch, 808 F.3d at 920 (quoting Nat'l Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1434 (D.C. Cir.

1995)).  In this vein, "the devotion of resources to advocacy for the organization's preferred policy — whether that advocacy is directed at Congress, the courts, or an administrative agency — falls short of the line."  Ctr. for Responsible Sci. v. Gottlieb, 346 F. Supp. 3d 29, 37 (D.D.C. 2018); see also Turlock Irrigation Dist., 786 F.3d at 24 (mentioning "litigation or administrative proceedings" as being insufficient); Ctr. for Law & Educ. v. Dep't of Educ., 396 F.3d 1152, 1161 (D.C. Cir. 2005) (mentioning lobbying as being insufficient).  Similarly, resources spent on, or in anticipation of, litigation cannot establish injury.  See Food & Water Watch, 808 F.3d at 919.

This is because these injuries are "self-inflicted" and thus insufficient for Article III purposes.  See, e.g., Abigail All., 469 F.3d at 133.  Indeed, the D.C. Circuit has occasionally expanded the definition of what is excluded from injury beyond the three categories already mentioned — to wit, normal-course educational initiatives, certain advocacy costs, and litigation expenses.  See Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity, 878 F.3d 371, 378–79 (D.C. Cir. 2017) (finding that organization's use of resources to "focus public attention on emerging privacy and civil liberties issue" was a "self-inflicted budgetary choice" insufficient for Article III); Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1276 (D.C. Cir. 1994) (finding that "diversion of resources to testing" — i.e., sending individuals to determine whether employer discriminated on basis of race — was "self-inflicted" result of plaintiff's "own budgetary choices" and did not confer standing).  At the same time, the Court of Appeals has made clear that an injury is not a "self-inflicted . . . budgetary choice[]" merely by having been made willfully or voluntarily.  See Equal Rights Ctr., 633 F.3d at 1139 (quoting BMC Mktg. Corp., 28 F.3d at 1276).  Rather, as

long as the organization expended resources "to counteract, the effects of the defendant['s]" challenged conduct, that diversion can suffice for Article III purposes. Id. at 1140.

Putting this all together, then, an organization seeking to bring a case in its own right must first allege that the challenged conduct perceptibly impairs its activities, as opposed to merely frustrating its mission. It then must show that it expended resources — beyond those normally carried out to advance such mission and excluding "self-inflicted" expenditures — to address that impairment.

The preceding discussion lays out only the required showing under the injury-in-fact element of Article III standing for an organizational plaintiff. Fortunately for the reader, not much need be said about the other two elements — causation and redressability. Those tests mirror, with little added gloss, the requirements for a non-organizational plaintiff who attempts to invoke the jurisdiction of the federal courts. In other words, an organizational plaintiff must show that its injury is "fairly traceable to the defendant's allegedly unlawful conduct." ASPCA, 659 F.3d at 24. It must also be "likely" that the injury would be "redressed by a favorable court decision." Id.

B. Application to CREW

Plaintiff, a non-profit organization, "is committed to protecting the rights of citizens to be informed about the activities of government officials and agencies." Compl., ¶ 13. To further its mission, it "routinely files complaints with government agencies identifying potential legal violations by public officials, and requesting that the agency investigate or take other appropriate action against the official." Id. CREW contends that it has standing to challenge OSC's decision not to institute MSPB proceedings against presidential appointees like Conway. See ECF No. 12 (Pl. Opp.) at 11–28. As will become plain shortly, however, it stumbles at the first step of the

organizational-standing test — to wit, injury.  The Court separately examines the two parts of that analysis.

### 1.  *Injury to Interests*

CREW identifies two purported organizational injuries.  For starters, it asserts harm based on an alleged decrease in the "deterrent effect of the . . . Act and CREW's complaints, insofar as it sends 'the message that there are no consequences for violating the [the statute].'" Id. at 16 (quoting Compl., ¶ 55).  This allegation does not require much more than a passing glance.  To establish injury, CREW must show that the challenged action perceptibly impairs its daily operations.  See PETA II, 797 F.3d at 1094.  Merely stating that the non-deterrent effect of such action — which Plaintiff has not even set out in its Complaint — is at odds with its mission of "promoting governmental integrity and accountability" is insufficient to establish standing. See Abigail All., 469 F.3d at 133 (alleging, without more, that "mission has been compromised" is not a cognizable injury); ASPCA, 659 F.3d at 25 (noting that organization cannot establish standing merely by seeking to "vindicate [its] own value preferences through the judicial process").

More plausibly, Plaintiff alleges that Defendant's inaction foreclosed "an avenue of redress" — *i.e.*, the MSPB enforcement scheme set forth in the CSRA — for its Hatch Act complaints and thus impedes its "discrete programmatic concerns."  Opp. at 13.  In effect, CREW maintains that the agency's failure to initiate MSPB proceedings against Conway (and other non-Senate-confirmed presidential appointees) "perceptibly impairs" its ability to fulfill its mission of "ensuring integrity in government."  Opp. at 15 (quoting Compl., ¶¶ 48, 50).  To bolster its case for organizational harm, CREW principally invokes two cases: Action Alliance of Senior Citizens v. Heckler, 789 F.2d 931 (D.C. Cir. 1986), and PETA II, 797 F.3d 1087.  See

Opp. at 13–18.  OSC rejoins that these cases do not control the standing inquiry here for a number of reasons.  See ECF No. 13 (Reply) at 7–10.  Some background may prove useful.

In Action Alliance, a senior citizens' group promoting the interests of the elderly — namely, "through informational, counseling, referral, and other services" — sued the Department of Health and Human Services for failing to administer the same age-discrimination regulations that it had issued to other federal agencies.  See 789 F.2d at 935.  The Court of Appeals determined that the group's "complaint identifie[d] concrete organizational interests detrimentally affected by" the agency's refusal to do so.  Id. at 937.  For example, by refraining from applying "government-wide regulations," the agency restricted "a generous flow of information" that the organization could then use "to refer [its] members to appropriate services" or to provide age-discrimination counseling.  Id.  Further, contrary to other agencies, the defendant's regulations included a "shield clause," which excepted HHS rules from claims that they were inconsistent with the Age Discrimination Act.  Id. at 935.  "By immunizing those regulations," the defendant deprived the organization of an "avenue[] of redress," leaving it with little, if any, basis to vindicate its core interests through the administrative process.  Id. at 935 n.3, 937–38.

Nearly thirty years later, our Circuit applied this reasoning in PETA II.  In that case, PETA, whose mission is to prevent "cruelty and inhumane treatment of animals," sued the Department of Agriculture for refusing to apply an animal-welfare statute to birds.  PETA II, 797 F.3d at 1094.  The court concluded that the organization had shown Article III injury, as USDA's inaction "perceptibly impaired" the organization's mission.  Id. at 1094–95.  Notably, the agency there had declined to investigate any administrative complaint concerning bird mistreatment that PETA filed, thereby cutting off a means by which the plaintiff advanced its mission.  Id. at 1095.

The organization, moreover, could not benefit from the investigative reports that the defendant would likely have produced in response to such complaints.  Id. at 1096.  Specifically, USDA's refusal to investigate these complaints "deprive[d] PETA of information on which it routinely relies in its efforts to educate the public," and thus directly impeded the organization's ability to perform its public-education services.  Id. at 1096 (citation omitted).

Here, OSC first points out that both decisions premised standing not only on the deprivation of an avenue of redress, but also on informational injury.  See Reply at 7 n.1.  In this Circuit, "a denial of access to information can work an 'injury in fact' for standing purposes, at least where a statute (on the claimants' reading) requires that the information 'be publicly disclosed' and there 'is no reason to doubt their claim that the information would help them.'" Ethyl Corp. v. EPA, 306 F.3d 1144, 1148 (D.C. Cir. 2002) (quoting FEC v. Akins, 524 U.S. 11, 21 (1998)).  Because Plaintiff advances no such informational-injury claim in this case, the argument goes, it flunks the first prong of the injury-in-fact requirement.  See Reply at 7 n.1. Defendant's position finds support in two recent opinions from courts in this district, which explained that the "combination of the two injuries" animated the D.C. Circuit's holdings in Action Alliance and PETA II.  See Marino v. Nat'l Oceanic & Atmospheric Admin., No. 18-2750, 2020 WL 1479515, at *5 (D.D.C. Mar. 26, 2020); United States v. Facebook, Inc., No. 19-2184, 2020 WL 1978802, at *3 (D.D.C. Apr. 23, 2020) (observing that "two injuries together supported standing" in PETA II).

CREW disagrees, contending that either type of harm — whether a "denial of 'access to information'" or a deprivation of an "avenue of redress" — "is independently sufficient to satisfy the organizational injury test."  Opp. at 15 n.1.  To be sure, Plaintiff is correct that the PETA II court discussed the two injuries separately.  See 797 F.3d at 1094 ("[T]he USDA's refusal to

apply the [statute] to birds 'perceptibly impaired' PETA's mission in two respects[.]"); see also
PETA v. USDA (PETA I), 7 F. Supp. 3d 1, 8 (D.D.C. 2013) ("PETA cites two injuries . . . .").
That, however, does not refute the argument that both harms together motivated the Circuit's
conclusions in Action Alliance and PETA II.  This is especially true in PETA II, where the
deprivation of an avenue of redress — i.e., the agency's failure to investigate administrative
complaints — directly contributed to the informational injury — viz., the loss of reports the
plaintiff would have received had the agency conducted such investigations.  See 797 F.3d at
1095–96.  Ultimately, because CREW fails to allege something more than the loss of an avenue
of redress, the Court is skeptical that its allegations suffice to show organizational harm.  See
Facebook, 2020 WL 1978802, at *4 (contrasting PETA II plaintiff's assertion of "two injuries
together" with organization's lack of any "informational aspect to its purported injury").

    In any event, the Court need not rest its decision on the absence of an informational
injury.  That is because even if the deprivation of an avenue of redress by itself could satisfy the
injury-in-fact requirement, Plaintiff would still come up empty.  To start, unlike in PETA II,
CREW can freely bring allegations of Hatch Act violations to OSC's attention.  Cf. PETA II,
797 F.3d at 1094 (explaining that defendant's inaction effectively "precluded PETA from . . .
submitting USDA complaints") (quoting PETA I, 7 F. Supp. 3d at 8); see also Opp. at 19
(admitting that it is not barred from filing complaints).  Defendant here "has neither changed its
complaint process nor adopted a policy categorically barring any type of complaints."  Facebook,
2020 WL 1978802, at *4.

    Contrary to Plaintiff's submission, moreover, OSC's non-prosecution decision regarding
Conway (or other presidential appointees like her) has not rendered "meaningless" the
administrative process.  See Opp. at 20 (quoting Action All., 789 F.2d at 937).  Far from it.

CREW's complaints against her have been thoroughly investigated and, indeed, vindicated, through OSC's determinations that she violated the Act.  Defendant even went so far as recommending Conway's removal to the President.  That he demurred does not mean that the process does not work.

Put another way, the organization's harm in PETA II "was grounded in the loss of a means of seeking redress, as opposed to dissatisfaction with the resulting redress itself." Facebook, 2020 WL 1978802, at *4.  While CREW may be unhappy with the President's refusal to punish a transgressing supporter — or, more fundamentally, with OSC's decision to send him the matter — that is a materially different harm from the one the Circuit found sufficient to confer standing in PETA II.

What is more, referring certain Hatch Act matters to the President for decision is not necessarily in "direct conflict" with CREW's mission.  See Abigail All., 469 F.3d at 133.  The President, after all, has plenary authority to take action that, in CREW's view, would "ensur[e] integrity."  Compl., ¶ 48; see 5 U.S.C. § 1215(b) (stating that some Hatch Act matters will be presented to President for "appropriate action").  That Plaintiff is unhappy that the President is the ultimate decisionmaker cannot be said to impair its mission.

Finally, the challenged activity in this case does not "undermine the organization's ability to perform its fundamental programmatic services."  Nat'l Veterans Legal Servs., 2016 WL 4435175, at *6.  Whether OSC makes a disciplinary recommendation to MSPB or to the President does not "raise the cost and difficulty" to CREW of filing Hatch Act complaints.  See Action All., 789 F.2d at 937.  And, unlike the Action Alliance plaintiff, which actively participated in the administrative process rendered null by the shield clause, CREW has no role

whatsoever in an MSPB proceeding.  Its involvement in the process ends as soon as it files the

administrative complaint.  In short, CREW has not established the requisite injury to its interests.

        2. *Resource Expenditures*

Even if Plaintiff had done so, it would still need to satisfy the second prong of the injury-

in-fact requirement.  See PETA II, 797 F.3d at 1094.  CREW maintains that it easily clears that

hurdle because it undertook several expenditures to counteract OSC's "failure to institute MSPB

proceedings against Conway."  Opp. at 24 (quoting Compl., ¶¶ 53–54).

More specifically, Plaintiff alleges that it has "resort[ed] to alternative avenues of redress

separate and apart from its normal practice of submitting Hatch Act complaints to OSC."

Compl., ¶ 53.  It lists the following "alternative avenues":

- "CREW launched a multi-faceted public campaign calling for Conway's resignation through hundreds of social media posts, mass emails to supporters, and a petition that has collected over 37,600 signatures to date."  Id., ¶ 53(a).

- "CREW wrote an op-ed published by *NBC News* calling on Conway to resign."  Id., ¶ 53(b).

- "CREW increased efforts to monitor Conway's public activity in order to identify potential Hatch Act violations . . . ."  Id., ¶ 53(c).

- CREW submitted a report to Twitter detailing Conway's purported Hatch Act violations, which also violated the company's terms of service.  Plaintiff therefore asked Twitter to "sanction Conway including by suspending her use of their platform."  Id., ¶ 53(d).

- "CREW submitted written testimony to Congress," urging it to take measures to ensure compliance with the Hatch Act and MSPB enforcement.  Id., ¶ 53(e) (citing Letter of June 26, 2019, from Virginia Canter, CREW's Chief Ethics Counsel, to House Committee on Oversight and Reform).

- "Crew sent OSC a letter . . . and urg[ed] it to file an MSPB complaint against Conway as required by [5 U.S.C.] § 1215."  Id., ¶ 53(f).

- "CREW regularly receives and responds to media inquiries for the purpose of conveying to the public the importance of Conway facing consequences for her

rampant Hatch Act violations in the absence of MSPB enforcement." Id., ¶ 53(g); see id. (citing articles in which Plaintiff advocated for Conway's firing). Finally, "CREW estimates that 18 of its employees have spent at least 175 hours to date" on these activities. Id., ¶ 54.

Unfortunately for Plaintiff, these resource expenditures do not get it across the finish line. For one, the bulk of its efforts appears to be aimed at penalizing Conway — whether getting her kicked off Twitter or bringing about the termination of her employment in the White House. See, e.g., id., ¶ 53(a)–(b), (d), (g). These actions, however, do not counteract the root source of CREW's purported injury. To be more concrete, they do not address Defendant's decision to refer Conway's case to the President instead of the MSPB.

Plaintiff's other allegations fare no better. It is unclear how monitoring Conway's conduct for Hatch Act violations, id., ¶ 53(c), and urging OSC to take action, id., ¶ 53(f), are a meaningful "diver[sion] or modif[ication] from CREW's "standard programmatic efforts that existed" before OSC's referral decision. Int'l Acad. of Oral Med. & Toxicology v. FDA (IAOMT), 195 F. Supp. 3d 243, 259 (D.D.C. 2016). Indeed, the Complaint makes clear that Plaintiff "closely monitors and scrutinizes government officials' conduct to identify potential Hatch Act violations and, where appropriate, files complaints with OSC requesting that it take legally-mandated disciplinary action against such officials, including instituting MSPB proceedings." Compl., ¶ 48; see also id., ¶ 13 (similar). Plainly, its efforts here "fall[] neatly within the core set of activities it has long performed." IAOMT, 195 F. Supp. 3d at 258.

Finally, CREW's campaign to influence Congress, see Compl., ¶ 53(e), cannot support standing either. In its letter to the House Committee on Oversight and Reform, Plaintiff advocated for several policy changes to the Hatch Act. See CREW's Ltr. of June 26, 2019, at 3–4. Among its requests, Plaintiff urged the Committee to "examine how to use the federal

appropriations process . . . to compel compliance" with the Act, id. at 3, and to "add[] larger civil penalties . . . for presidential appointees and repeat offenders." Id. at 4. It also asked Congress to "ensur[e] that OSC is actually referring violations by presidential appointees like Ms. Conway to the [MSPB]." Id. As this Court has made clear, however, "the devotion of resources to advocacy for the organization's preferred policy" does not count as resource expenditures to counteract an Article III harm. Ctr. for Responsible Sci., 346 F. Supp. 3d at 37; see also Nat'l Ass'n of Home Builders v. EPA, 667 F.3d 6, 12 (D.C. Cir. 2011) (mentioning "testifying before the United States Senate" and "submitting comments to the EPA" as being insufficient). In brief, CREW's efforts do not satisfy the second prong of the injury-in-fact requirement.

*     *     *

Beyond these specific organizational-standing obstacles, the Court's decision is consistent with other general standing principles. At bottom, CREW's beef is that OSC is flouting the statute by not prosecuting Conway before the MSPB. Even assuming that Defendant should have done so, see City of Waukesha v. EPA, 320 F.3d 228, 235 (D.C. Cir. 2003) (assuming that plaintiff is correct on merits for standing inquiry), CREW has no greater stake in the disciplinary proceeding to which Conway ultimately is, or is not, subject than any other member of the public. See Seegars v. Gonzales, 396 F.3d 1248, 1253 (D.C. Cir. 2005) ("[I]njuries that are shared and generalized—such as the right to have the government act in accordance with the law—are not sufficient to support standing[.]"). Just because Plaintiff filed the complaint that led to the agency's finding of Hatch Act violations by Conway does not entitle it, more than any other member of the public, to invoke federal-court jurisdiction to compel OSC to prosecute. Id.

21

Even a "self-appointed representative of the public interest . . . must show that the defendant's conduct has affected [it] in a 'personal and individual' way." EPIC v. Presidential Advisory Comm'n on Election Integrity, 266 F. Supp. 3d 297, 306 (D.D.C. 2017) (quoting Lujan, 504 U.S. at 560 n.1). Yet, as this Court has already set out above, CREW has not made that showing. It, accordingly, may not "employ a federal court as a forum in which to air . . . generalized grievances about the conduct of government." Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 483 (1982) (ellipsis in original) (quoting Flast v. Cohen, 392 U.S. 83, 106 (1968)).

That's not all. Further weakening CREW's standing is the fact that it seeks to compel a federal court to mandate the prosecution of a third party. The Supreme Court, however, has made clear that "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution. . . . [I]n American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973); see also Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 37 (1976) (similar).

These additional reasons reinforce the determination that CREW has not established standing. While the Court understands Plaintiff's frustration that Conway is continuing to violate the Hatch Act with seeming impunity, it must hew to its jurisdictional borders. Those do not permit its intrusion here.

## IV.   Conclusion

The Court, accordingly, will grant Defendants' Motion to Dismiss. A separate Order so stating will issue this day.

_/s/ James E. Boasberg_
JAMES E. BOASBERG
United States District Judge

Date: <u>August 6, 2020</u>